UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Angelika P., for herself and as
guardian and next friend of N.P.,
an incapacitated adult,
        Plaintiffs

        v.                              Case No. 19-cv-1114-SM
                                        Opinion No. 2020 DNH 166

Town of Meredith,
        Defendant

## O R D E R

Angelika P. ("Angelika") filed this action for herself, and
as guardian and next friend of N.P., her son, against the Town
of Meredith, asserting, inter alia, violations of the Americans
with Disabilities Act, 42 U.S.C. § 12101 et. seq., and the
Rehabilitation Act of 1973, 29 U.S.C. § 794.  After filing its
answer, the Town promptly moved for judgment on the pleadings.

### Standard of Review

A motion for judgment on the pleadings under Fed. R. Civ.
P. 12(c) is subject to the same standard of review applicable to
a motion to dismiss under Rule 12(b)(6).  See Portugues-Santana
v. Rekomdiv Int'l, Inc., 725 F.3d 17, 25 (1st Cir. 2013).
Accordingly, the court must accept as true all well-pleaded
facts in plaintiffs' complaint and indulge all reasonable
inferences in her favor.  See Doe v. Brown Univ., 896 F.3d 127,
130 (1st Cir. 2018); SEC v. Tambone, 597 F.3d 436, 441 (1st Cir.

2010).  But, "[a] Rule 12(c) motion, unlike a Rule 12(b)(6) motion, implicates the pleadings as a whole," and therefore the court may consider the facts alleged in defendant's answer. Aponte-Torres v. Univ. Of Puerto Rico, 445 F.3d 50, 54-55 (1st Cir. 2006).  However, because the court is obligated to view the facts in favor of the non-movant, "any allegation in the answer that contradict[s] the complaint" is treated as false.  Goodman v. Williams, 287 F. Supp. 2d 160, 161 (D.N.H. 2003) (citations omitted).

To survive defendant's motion, the complaint must allege each of the essential elements of a viable cause of action and "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation and internal punctuation omitted).  Legal boilerplate and general conclusory statements are insufficient to state a cognizable claim.  See Menard v. CSX Transp., Inc., 698 F.3d 40, 45 (1st Cir. 2012). Nevertheless, while "evaluating the plausibility of a legal claim requires the reviewing court to draw on its judicial experience and common sense, the court may not disregard properly pled factual allegations, even if it strikes a savvy judge that actual proof of those facts is improbable."  Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (citations and internal punctuation omitted).

## Background

The complaint discloses the following.  Plaintiff, N.P.,
lives with his mother and guardian, Angelika, in Meredith, New
Hampshire.  He is intellectually disabled.  On recent cognitive
functioning tests, N.P. scored below the first percentile, in
the extremely low range for verbal comprehension, and, with
respect to nonverbal intelligence, he scored in the "very poor"
range compared to other students his age.  N.P. tested in the
"very low to severe range" of language functioning.  Compl. ¶ 6.
At the time of the events giving rise to this action, N.P. was
20 years old.

N.P. has attended day camps offered by the Town of Meredith
during summers and school vacations since 2015.  The day camps
are run by Meredith's Department of Parks and Recreation.
Activities are conducted at the Town's Recreation Center.  In
2019, the summer camp ran from June 25, 2019, through August 16,
2019.

On August 6, 2019, a day camper reported that N.P. had made
comments threatening camp staff.[1]  In response, Sarah Perkins,
the camp director, and the Town's Program Director for the

---

[1]    In its Answer, defendant asserts that the camper reported
N.P. threatened to kill three individuals: the camp director
(Sarah Perkins), a summer camp counselor, and that camp
counselor's child.

Department of Parks and Recreation, notified the Meredith Police
Department, who dispatched an officer.

The responding police officer, Keith True, who also served
as the resource officer at the Town's high school (where N.P.
had been a student), knew N.P., and knew that N.P. was seriously
intellectually disabled.  Presumably, camp staff, directors, and
Town officials had the same information about N.P.'s profound
disabilities, as he had been a regular camper for years.

Upon arriving at the Town's Recreation Center, Officer True
spoke with N.P., and asked him if he had "heard anyone say
anything that may have scared someone."  Compl. ¶ 12.  N.P.
responded that he had not made the comments, because he had not
been at camp, he had been at an appointment.  Officer True asked
N.P. if N.P. heard "anyone making statements about hurting or
killing someone, even as a joke."  Compl. ¶ 12.  N.P. said he
had not, that he "wouldn't say anything like that."  Id.
According to True, "N.P. did not know why Officer True was at
camp[,] [or why True] wanted to speak with him."  Id.

After he spoke with N.P., Officer True met with Perkins and
Vint Choiniere, Director of the Town's Parks and Recreation
Department.  True told Perkins and Choiniere that he did not
believe N.P. posed a threat, and that True had not known N.P. to

be violent.  True then left the camp.  No charges were filed
against N.P.

N.P. remained at camp for the rest of the day without
incident.  When Angelika arrived to pick him up, Choiniere
handed her a "Meredith Parks and Recreation Behavior Report."
Choiniere told Angelika that N.P. was suspended from
participating in any Parks and Recreation Department program,
and from being at any Parks and Recreation facility "for an
indefinite period of time."  Compl. ¶ 15.

That evening, Angelika emailed Phillip Warren, Meredith's
Town Manager.  She explained N.P.'s intellectual disability, and
that N.P. "has no real concept of what is being said or
discussed beyond the surface," or any idea that he had made any
threats.  Compl. ¶ 16.  Angelika told Warren that N.P. "enjoys
camp so much, and knowing [camp] is coming to an end makes him
sad [so] . . .  he has had behavior incidents towards the end of
camp in past years, knowing that it was going to end."  Id. at ¶
16.  She asked to meet with Warren in person to discuss N.P.'s
suspension, arguing that the suspension "is extreme for someone
who does not even know what he did or said[,] and has the mental
ability of a young child."  Id.  Angelika asked the Town to
modify the duration of N.P.'s indefinite suspension, to instead
make the suspension "temporary, maybe for one or two days."  Id.

If N.P. misbehaved after he returned to camp, the Town could call her "immediately, and [she] would remove him from camp for the rest of the day." Id.

Warren responded the next morning, August 7, 2019. Warren told Angelika that he needed to review the police and internal reports, and that "the suspension [would] remain in place until the investigation and research into this matter is completed." Compl. ¶ 17. Once completed, he said, Angelika would be notified of the outcome.

Angelika addressed the Town's Behavior Report that same day and asked that her response be appended to the Report. She wrote that N.P. had a "significant intellectual disability that limits his understanding of questions being asked," and "usually respond[ed to questions] based on what he thinks the person [asking] wants to hear." Compl. ¶ 19. She further wrote, "N.P. does not understand, or even recall the event, but the staff at the community center, especially those who have known N.P for the past four years, should understand that just because he is older, his intellectual ability remains that of a six-year-old." Id. Finally, Angelika expressed her disappointment that the Town had not involved her in the decision-making process "in order to get a better understanding of an intellectually-challenged individual." Id.

Warren emailed Angelika again on August 12, 2019.  He
informed her that N.P. would remain suspended for an initial
period of 60-days (through October 7, 2019), after which
Angelika could speak to Choiniere about readmitting N.P. to the
Parks and Recreation Department's programs and facilities.  N.P.
was emotionally upset and very sad when told he could not return
to camp for the rest of the summer.[2]

On September 2, 2019, Angelika requested a copy of the
investigatory findings that Warren had referenced in his August
7 email.  Warren responded that "the investigation was a review
of police and internal reports," and that no report had been
drafted.  Compl. ¶ 23.  Two days later, Angelika met with
Jeannie Forrester and Ray Moritz, two members of the Town's
Select Board.  During the meeting, Moritz told Angelika that, by
allowing N.P. to remain at camp through the end of the day on
August 6, 2019, the Town had been "compassionate," as "they
could have called to have him handcuffed and dragged away."
Compl. ¶ 24.  Moritz further stated that he and Forrester would
present the matter to other members of the Select Board
privately.

---

[2]     The defendant points out in its Answer that the Town did
not offer any summer or school vacation camps between August 16,
2019 and October 7, 2019.  So, says the Town, N.P.'s suspension
from Town programs and parks was, in effect, eight days long.

On September 17, 2019, Moritz emailed Angelika, informing her that the Meredith Select Board supported the action taken by the Parks and Recreation Department.

N.P.'s suspension ended on October 7, 2019.

## DISCUSSION

1. Plaintiffs' Claims Under the ADA and Rehabilitation Act

First, the Town argues that plaintiffs' claims under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act fail because the Town did not discriminate against N.P. based on his disability, but rather acted in response to "threats" that N.P. made.  (Apparently overlooking, at the outset, that "threats" must be assessed in context.  For example, a six year old child proclaiming, "I'll kill you if you tell Mom I ate the cookie" has, in context, hardly made a death threat, though one might try to make it so by reciting merely, "I'll kill you" out of context.  Common sense, it is often correctly noted, is not so common, but in its pursuit, context is of course everything.)

Pursuant to Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. §

12132.  Accordingly, "[t]o state a claim for a violation of
Title II, a plaintiff must allege: (1) that he is a qualified
individual with a disability; (2) that he was either excluded
from participation in or denied the benefits of some public
entity's services, programs, or activities or was otherwise
discriminated against; and (3) that such exclusion, denial of
benefits or discrimination was by reason of his disability."
Toledo v. Sanchez, 454 F.3d 24, 31–32 (1st Cir. 2006) (citing
Parker v. Universidad de Puerto Rico, 225 F.3d 1, 4 (1st Cir.
2000), and 42 U.S.C. § 12132).  Similarly, to state a claim
under the Rehabilitation Act, a plaintiff must allege "that (1)
they are disabled as defined by the statute; (2) they are
otherwise qualified for the program, activity, or benefit at
issue; (3) they have been excluded from the program, activity,
or benefit solely by reason of their disabilities; and (4) the
program, activity, or benefit is funded by federal financial
assistance."  Eric L. By & Through Schierberl v. Bird, 848 F.
Supp. 303, 313 (D.N.H. 1994).

    The parties' respective arguments[3] with respect to the
pending motion focus on causation.  First, the parties disagree

---

[3]    At this time, defendant does not contest that N.P. is a
"qualified individual with a disability," defined by the ADA as
"an individual with a disability who, with or without reasonable
modifications to rules, policies, or practices, the removal of
architectural, communication, or transportation barriers, or the
provision of auxiliary aids and services, meets the essential
eligibility requirements for the receipt of services or the

as to whether the Rehabilitation Act and the ADA have different causation requirements.  Plaintiffs argue that both the ADA and the Rehabilitation Act require "but for" causation, while defendant contends that the Rehabilitation Act's causation standard is more exacting, requiring that discrimination by reason of disability be the only cause of the action at issue. For purposes of the present motion, the court need not resolve the dispute, as the outcome is the same under either standard.

Substantively, defendant contends that the complaint, at best, essentially pleads that because N.P. has an intellectual disability, he uttered words that, literally, amount to threats to which the Town lawfully responded by suspending him. According to the Town, even though N.P.'s "threats" may have resulted from his disability, that does not make his suspension based on those threats a discriminatory act.  N.P. was suspended because of his misbehavior – uttering words that amounted to threats – says the Town, and not his disability.  The Town points out that N.P. has participated in the summer day-camp

participation in programs or activities provided by a public entity."  42 U.S.C. § 12131.

Defendant does make the argument that the Town did not receive federal funds in 2019, and the Rehabilitation Act is therefore inapplicable.  However, defendant concedes that plaintiffs have alleged the Town received federal funds.  Given the case's procedural posture, the court is bound to accept plaintiffs' allegations as true, and defendant's argument regarding the applicability of the Rehabilitation Act is unavailing at this early juncture.

program for several years, and the Complaint specifically
acknowledges that N.P. has had behavioral issues in past years.
See Compl. ¶ 16 (N.P. "had behavior incidents toward the end of
camp in past years").  But, the Town argues, N.P. was suspended
only after he made the "threats" concerning other participants
and staff within the camp program.  That is not discrimination,
says the Town, "[t]hat is a safety measure."  Mem. in Supp. of
Mot. for Judgment on the Pleadings at 9.

     In response, plaintiffs contend that defendant's argument
prevails only if plaintiffs' asserted version of the facts is
deemed false, which, of course, is an impermissible
determination on a motion for judgment on the pleadings.
According to the plaintiffs, they have not alleged in the
complaint that N.P. made threats.  Plaintiffs further rely on
Officer True's assessment following his conversation with N.P.
that N.P. did not pose a threat.  They argue:

> It is reasonable to infer [from plaintiffs' allegations]
> that given 1) the severity of NP's intellectual and
> language disability; 2) that the responding officer
> found any claim of a threat to be unfounded; and 3) that
> NP remained at the camp for the rest of the day, that
> excluding NP not only from the rest of camp, but from
> any facility or activity for 60 days was arbitrary and
> unreasonable and based on fears or stereotypes of
> mentally disabled individuals.

Pls.' Opp. to Mot. for Judgment on the Pleadings at 6.

Had plaintiffs alleged that N.P. did, in fact, make
credible or even sincere death threats against three individuals
at summer camp, even if those threats were a consequence of
plaintiff's disability, defendant's position, which is well-
supported by relevant precedent, would prevail.  Courts have
nearly uniformly rejected the idea that the ADA requires
entities to countenance misconduct.  As the Court of Appeals for
the Fourth Circuit stated: "misconduct – even misconduct related
to a disability – is not itself a disability and may be a basis
for dismissal."  Halpem v. Wake Forest Univ. Health Scis., 669
F.3d 454 (4th Cir. 2012) (citations omitted).  In the employment
context, our own court of appeals has similarly noted: "Put
simply, the ADA does not require that an employee whose
unacceptable behavior threatens the safety of others be
retained, even if the behavior stems from a mental disability."
Calef v. Gillette Co., 322 F.3d 75, 87 (1st Cir. 2003) (emphasis
added).

A Title II case that arose in the Court of Appeals for the
Second Circuit, McElwee v. Cty. of Orange, 700 F.3d 635, 642 (2d
Cir. 2012), is instructive.  In McElwee, the plaintiff was
dismissed from defendant's volunteer program after engaging in
"erratic and harassing behavior toward female staff members."
Id. at 637.  Plaintiff, who suffered from a neurodevelopmental
disorder called Pervasive Development Disorder – Not Otherwise

Specified ("PDD-NOS"), filed suit under Title II of the ADA and
Section 504 of the Rehabilitation Act, arguing that his
dismissal constituted "unlawful discrimination because he was
not provided a reasonable accommodation for his disability,"
namely: (1) defendants should have worked with him "to help him
behave more appropriately in the workplace; and (2) defendants
should have worked with the complaining employees "to educate
them about [plaintiff's] disability so that they would be more
tolerant of his behavior." Id. at 644. The Second Circuit
disagreed, noting that plaintiff's claim "is as much a request
to excuse his past misconduct as it is a request for future
accommodation," and that plaintiff's "inappropriate behavior is
indisputably a legitimate non-discriminatory reason for
dismissing [plaintiff] from the volunteer program, even if the
behavior resulted from his disability." Id. at 644. See also
Halpern, 669 F. 3d at 465 ("[T]he law does not require the
school to ignore misconduct that has occurred because the
student subsequently asserts it was the result of a
disability.").

So, again, had plaintiffs clearly alleged in their
complaint that N.P. made credible or non-frivolous death threats
against three individuals at the Town's summer camp, defendant's
argument would be persuasive under the existing law.

But, the problem with defendant's argument is that whether N.P. did or did not make the referenced "threats" is simply not clear from the facts pled in the complaint or asserted in the answer.  Nor is any critical context discernable from the complaint or the answer.  Plaintiffs allege that another camper heard N.P. make comments which that camper <u>interpreted</u> as threats.  Compl. ¶ 10.  The complaint also alleges that, while speaking to Officer True, N.P. denied making any threats.[4]  Given the factual ambiguities, and in the absence of the full relevant context in which the words triggering defendant's actions were spoken, and how they would have been understood by reasonable people unburdened by misguided fears or stereotypes related to mental disabilities, and acting in good faith, it is obvious that a more fully developed record is necessary before the court could properly rule on defendant's dispositive motion.  It is not at all clear that plaintiff's words, even if uttered as defendant claims, could have been reasonably understood by reasonable people actually informed of the plaintiff's disability as actionable "threats," or as posing any safety concern under the actual circumstances.  It may well be, however the facts are pled or established on summary judgment,

---

[4]    In that same paragraph, plaintiffs allege that N.P. told Officer True he "wasn't even at camp."  But, based on the complaint's allegations, N.P. was, in fact, present at camp, and N.P. may or may not have had the ability to accurately recall and respond.

that a jury will have to resolve those questions.  But for now, given the restrictions applicable to motions for judgment on the pleadings, the motion is necessarily denied.

2.   Angelika P.'s ADA Claim

Defendant argues that Angelika's individual claim under the ADA must be dismissed because she has not alleged any facts showing that she, personally, was denied services or activities. Defendant is correct.

Pursuant to 28 C.F.R. § 35.130(g), "[a] public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association."  Decisions in this circuit interpreting the associational discrimination provisions of the ADA appear to be somewhat limited, but the parties seemingly agree that, to state an association claim, Angelika must allege an injury separate from N.P.'s injury resulting from her association with a disabled individual.  See Pl.'s Mem. in Supp. of Opp. to Mot. for Judgment at 15; Def.'s Mem. in Supp. of Mot. for Judgment at 13.  See also Glass v. Hillsboro Sch. Dist. 1J, 142 F. Supp. 2d 1286, 1292 (D. Or. 2001) ("plaintiffs appear to recognize that to prevail on their associational discrimination claims, they must allege and prove

that they, not their children, had a right to defendant's
services, and that they were discriminated against in obtaining
those services solely because they were associated with disabled
individuals."); United States v. Nobel Learning Communities,
Inc., 676 F. Supp. 2d 379, 388 (E.D. Pa. 2009) ("Courts that
have specifically addressed whether indirect consequences give
rise to an associational discrimination claim have held that
Title III of the ADA does not protect against such injuries.")
(citing cases).

Angelika alleges that she was denied the ability "to have
her child participate in Meredith Parks and Recreation
Department programs and activities."  Compl. ¶ 48.  She argues
that said denial "is a separate injury from the injury NP
suffered."  Mem. in Opp. to Mot. for Judgment on the Pleadings
at 15.  But, she is incorrect: Angelika's alleged injury is
derivative of N.P.'s injury, not a separate injury.  She has not
alleged that she, personally, was denied services by the Town,
but rather that she was injured because her son was denied
services.  In other words, Angelika has not alleged that the
Town directly discriminated against her, but instead alleges
that she was injured as a result of the Town's discrimination
against her son.  For that reason, defendant is entitled to
judgment on Angelika's ADA claim.

16

To the extent Angelika can plausibly assert factual allegations that would support a cognizable ADA claim against the Town, she is free to file a motion to amend her complaint. See Ashcroft v. Iqbal, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

### 3.   Failure to Train and Supervise

The Town contends the failure to train and supervise claim must be dismissed because plaintiffs fail to allege facts sufficient to state such a claim.[5]  It argues that plaintiffs' complaint lacks any factual allegations suggesting the Town inadequately trained its employees, or any facts that show a pattern of similar violations by untrained employees.  Instead, defendant says, plaintiffs rely on wholly conclusory allegations in support of their claim.

"Triggering municipal liability on a claim of failure to train requires a showing that municipal decisionmakers either knew or should have known that training was inadequate but

---

[5]   Defendant also argues that plaintiffs' failure to train claim must be dismissed because plaintiffs fail to sufficiently state an underlying ADA or Rehabilitation Act claim.  However, the court has determined that plaintiffs have, at this juncture, sufficiently stated a claim under the ADA and Rehabilitation Act.

nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies." Haley v. City of Bos., 657 F.3d 39, 52 (1st Cir. 2011).  When evaluating a municipal liability claim that requires proof of deliberate indifference, the plaintiff must plead more than a 'mere insufficiency' of the municipality's actions." Tortorello v. Laconia Police Dep't, No. 19-CV-250-PB, 2020 WL 2404859, at *2 (D.N.H. May 12, 2020) (quoting Marrero-Rodríguez v. Municipality of San Juan, 677 F.3d 497, 503 (1st Cir. 2012)).  "Instead, 'a training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing.'"  Id. (quoting Marrero-Rodriguez, 677 F.3d at 503) (alteration omitted) (further quotations omitted)).  See also Nevins v. Mancini, No. CIV. 91-119-M, 1993 WL 764212, at *3 (D.N.H. Sept. 3, 1993) ("Generally, a failure to supervise only gives rise to § 1983 liability 'in those situations where there is a history of widespread abuse[,][o]nly then may knowledge be imputed to the supervisory personnel.'") (citing Wellington v. Daniels, 717 F.2d 932, 936 (4th Cir.1983)).

Plaintiffs' failure to train and supervise claim falls far short of meeting those requirements.  As defendant correctly points out, plaintiffs' claim is comprised entirely of

conclusory allegations.  See, e.g., Compl. ¶ 60 ("Defendant had
notice that its supervising and training was deficient because
N.P. has a right to participate in its programs and activities,
but was not allowed to attend its programs and activities for 60
days.").  Notably lacking are any underlying factual allegations
that support plaintiffs' legal conclusions.  Plaintiffs fail to
provide any details regarding defendant's training program, or
how that program might be even arguably deficient.  Nor does the
complaint allege any facts from which the court might infer that
defendant disregarded a known risk.

Accordingly, plaintiffs have not stated a Section 1983
claim against the Town for failure to train and supervise.  See
Iqbal, 556 U.S. at 678 ("the tenet that a court must accept as
true all of the allegations contained in a complaint is
inapplicable to legal conclusions.  Threadbare recitals of the
elements of a cause of action, supported by mere conclusory
statements, do not suffice.").  To the extent plaintiffs can
capably assert factual allegations that would support a
cognizable Section 1983 claim against the Town, they are free to
file a motion to amend their complaint.

4.   Plaintiffs' Requests for Relief

Finally, defendant persuasively argues that plaintiffs are
not entitled to a declaratory judgment or to an injunction, as

both requests are moot.  Plaintiffs seek, <u>inter</u> <u>alia</u>, the
"issuance of a declaratory judgment that Defendant has violated
the Americans with Disabilities Act and its implementing
regulation and the Rehabilitation Act of 1973 and its
implementing regulations," as well as "an [o]rder enjoining
Defendant from excluding N.P. from its programs, services and
activities on the basis of his disability, and requiring
Defendant to engage in an interactive process when a reasonable
accommodation would enable his participation."  Compl., p. 13.

"[A] case is moot when the issues presented are no longer
live or the parties lack a legally cognizable interest in the
outcome."  <u>Town of Portsmouth, R.I. v. Lewis</u>, 813 F.3d 54, 58
(1st Cir. 2016) (quoting <u>Am. Civil Liberties Union of Mass. v.</u>
<u>U.S. Conference of Catholic Bishops</u>, 705 F.3d 44, 52 (1st Cir.
2013)).  "Another way of putting this is that a case is moot
when the court cannot give any effectual relief to the
potentially prevailing party."  <u>Id</u>. (quoting <u>Am. Civil Liberties</u>
<u>Union</u>, 705 F.3d at 52).

In support of its argument, defendant points out that
N.P.'s 60-day suspension was complete on October 7, 2019; he is
no longer suspended from any Town parks or programs.  Moreover,
N.P. has since turned 21, and has therefore "aged out" of
eligibility for the Town's camp programs.  Thus, defendant says,

there is no pending controversy.  Plaintiffs seemingly do not contest the point as they fail to meaningfully respond.

N.P.'s 60-day suspension is over.  He is not currently being excluded from defendant's programs, services and activities.  Accordingly, "there is no ongoing conduct to enjoin," Town of Portsmouth, 813 F.3d at 58, and plaintiffs are not entitled to injunctive relief.  Nor are plaintiffs entitled to a declaratory judgment.  See Am. Civil Liberties Union, 705 F.3d at 53 ("issuance of a declaratory judgment deeming past conduct illegal is . . . not permissible as it would be merely advisory.  The Supreme Court has admonished that federal courts 'are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong.'") (quoting Spencer v. Kemna, 523 U.S. 1, 18, (1998)) (internal citations omitted).  Any controversy concerning defendant's actions is "neither immediate nor real," id., as N.P. is currently permitted to enjoy the parks and participate in the Town's programs and activities (to the extent he is otherwise eligible).

Defendant's motion for judgment on plaintiffs' request for injunctive and declaratory relief is therefore granted.

## CONCLUSION

This dispute ought to have been resolved short of litigation.  Plaintiffs' basic social complaint is not an unreasonable one: on its face, they describe what could well be governmental action based not on legitimate safety concerns, but rather on discriminatory stereotypes rooted in unfounded assumptions about cognitive disabilities.

The plaintiffs' case may fall short under applicable law, but not before a full evidentiary development of the context in which N.P.'s "six-year-old" words, or "threats," were expressed, including how they were understood by those decision-makers involved and how they should have been understood by a reasonable person informed of the facts.  That may require a trial or, at a minimum, well-supported summary judgment briefing.

The facts developed may well support judgment for the Town as a matter of law.  But, it is equally plausible at this point that words uttered by a person cognitively functioning at a six-year-old level must be evaluated as such – particularly by those charged with the responsibility to know and conform their conduct to the law protecting citizens from unwarranted discrimination.  Mere recitation of maxims like "safety," unsupported by informed judgment or fact may well not suffice.

It may be that this case is distinguishable from those looking only to conduct and not cause, in that, here, it seems not so much that the disability <u>caused</u> sanctionable behavior, but, rather, that the behavior itself is not sanctionable – because the known disability precludes a sanctionable construction of a "six year old's" words when that six year old is known to those seeking to impose the sanction, and who have been advised by an informed police officer that neither the person nor the words pose a threat.

These are not simple issues.  It would behoove the parties, with the assistance of counsel, to resolve this matter on rational and reasonable terms acceptable to both sides.  The principles at stake are important ones, and the legal outcome is far from clear; litigation may prove burdensome, and, in the end, unsatisfying to all.

For the foregoing reasons, as well as those in defendant's memoranda in support of its motion, defendant's motion for judgment on the pleadings (document no. 8) is **<u>GRANTED</u>** in part and **<u>DENIED</u>** in part.

     **SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

October 1, 2020

cc:  Counsel of Record