UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Angelika P., for herself and as
guardian and next friend of N.P.,
an incapacitated adult,
      Plaintiffs

                                        Case No. 19-cv-1114-SM
      v.                                Opinion No. 2022 DNH 026

Town of Meredith,
      Defendant

**O R D E R**

This case presents a sympathetic plaintiff whose 20-year-old son, N.P., has profound cognitive disabilities.  In 2019, the Town of Meredith suspended N.P. from a municipal summer camp program for uttering words constituting death threats, notwithstanding N.P.'s developmental age of about six years, and despite his apparent lack of ability to carry out any such threats.  N.P.'s suspension was based on that misconduct, and its asserted negative effects on camp staff and other campers.  That is, the Town determined that N.P.'s threatening words themselves warranted imposition of discipline, without regard to the context (N.P.'s childlike cognitive abilities) and the absence of any assessment of whether N.P. posed a credible risk of actual harm (the Town concedes that it did not perform any "risk assessment"; it suspended N.P. based on the misconduct alone).

Angelika P. ("Angelika") filed this suit on behalf of herself and as guardian and next friend of N.P., against the Town of Meredith, asserting, inter alia, violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 et. seq., and the Rehabilitation Act of 1973, 29 U.S.C. § 794.  The Town moved for judgment on the pleadings, and the court dismissed several of plaintiff's claims, including those she asserted on behalf of herself.  The Town now moves for summary judgment on plaintiff's remaining claims, all of which fall under Title II of the Americans with Disabilities Act.

## Standard of Review

When ruling on a motion for summary judgment, the court is "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  Block Island Fishing, Inc. v. Rogers, 844 F.3d 358, 360 (1st Cir. 2016) (citation omitted).  Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In this context, a factual dispute "is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party, and 'material' if its existence or nonexistence has the potential to change the outcome of the suit."  Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016) (citation omitted).

Consequently, "[a]s to issues on which the party opposing summary judgment would bear the burden of proof at trial, that party may not simply rely on the absence of evidence but, rather, must point to definite and competent evidence showing the existence of a genuine issue of material fact." Perez v. Lorraine Enters., 769 F.3d 23, 29-30 (1st Cir. 2014).  In other words, "a laundry list of possibilities and hypotheticals" and "[s]peculation about mere possibilities, without more, is not enough to stave off summary judgment." Tobin v. Fed. Express Corp., 775 F.3d 448, 451-52 (1st Cir. 2014).  See generally Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

**Background**

The undisputed material facts, and disputed material facts construed in the light most favorable to Angelika P., are as follows.  N.P lives in Meredith, New Hampshire.  He is profoundly intellectually and emotionally disabled.  At the time of the events giving rise to this suit, N.P. was 20 years old, but his intellectual and emotional development were roughly equivalent to that of a six-year-old child.  N.P. cannot be left at home alone, nor can he go anywhere unattended.  He requires assistance to dress appropriately for weather conditions, and cannot follow two-step directions.  N.P. was provided with special education services throughout years in public school.  When he attended school, he was placed in a classroom with other

students with serious disabilities.  He was provided with a
full-time one-on-one aide, and received group speech therapy
services.  According to plaintiff, N.P. "does not understand the
depth and meaning of what he says.  He will often offer an
appropriate response to a question, but when asked for his
understanding of what was asked, it can be completely unrelated
to what was actually asked."  Pl.'s Obj. to Summary Judgment at
2-3.  N.P.'s grandmother testified similarly, noting that N.P.
"talks no sense all the time."  Id. at 3.

The Town of Meredith operates a summer day camp program for
students entering kindergarten through eighth grade (roughly
ages five through 14).  The camp is operated by Meredith's Parks
and Recreation Department.  N.P. has been accepted into the camp
each summer since 2016, despite his falling outside the camp's
(biological) age range.  Before N.P. attended camp for the first
time, his mother, Angelika, met with Sarah Perkins, the camp
director, to explain his disabilities, diagnoses, medications,
and treatment plans.  In the years that followed, when she
dropped N.P. off at camp in the morning, Angelika spoke with
staff about N.P.'s appointments, medication adjustments, and
general well-being (e.g., whether N.P. had slept well and was
rested).

The events giving rise to this suit occurred in August of
2019, at the Meredith Community Center, about ten days before
the end of the camp's season.  On August 6th, J.S., a day camper
in the sixth-to-eighth grade age group, reported to Director
Perkins that N.P. made threats to kill her, Kirby Corliss (a
counselor at the camp), and Corliss's son (who was also a
camper).  Perkins called her supervisor, Vint Choiniere, the
Director of Meredith's Parks and Recreation Department, and
Meredith Police Officer Keith True, to pass along the report of
N.P.'s threatening words.  Officer True went to the Community
Center to look into the matter.

### 1.   Officer True's Investigation

Officer True served as the resource officer at the Town's
high school and, in that capacity, he was familiar with N.P.  He
arrived at the Meredith Community Center around noon.  He spoke
with Perkins, and then with J.S.  J.S. told Officer True that he
overheard N.P. make a comment about killing "Sarah."  According
to J.S., another camper then mentioned that "Sarah" was the camp
director, and N.P. allegedly responded, "Not for long, I'm gonna
kill her and Kirby [Corliss] and [Kirby's son]."  Def.'s Mot.
for Summary Judgment, Exh. 1 at 1.  J.S. told N.P. that he was
going to report N.P.'s comment to Perkins, and N.P. walked away
"swearing at [J.S.] under his breath."  Id.  Officer True later
testified that J.S. "was very concerned about what was being

said because [J.S.] thought for sure that somebody could get hurt[,] and if he didn't say something he would feel bad about it."  Def.'s Mot. for Summary Judgment, Exh. 8, True Dep. 48:10-13.

Officer True then spoke with N.P., who at that time was with other campers in or near the gymnasium.  True pulled him aside, into the hallway.  N.P. denied making the statements.  He told Officer True that he had not even been at camp, but instead claimed to have been at an appointment.  True later testified that N.P. seemed "normal," and "seemed like the [N.P.] I knew" from school.  Def.'s Mot. for Summary Judgment, Exh. 8, True Dep. 31:1-4.  After speaking with N.P., True left him with the other campers (supervised by the camp's staff), and went to speak with Director Perkins again.  Perkins told True that N.P. had recently taken her cell phone and keys home with him, and that she would sometimes find N.P. staring at her for extended periods of time.

After being assured that one of the camp's counselors would keep an eye on N.P., Officer True returned to the Meredith Police Department.  He called Angelika and left a message asking her to return his call.  True also spoke with the Director of the Parks and Recreation Department, Vint Choiniere, who expressed a general concern for the safety of his staff and any

campers who might have overheard N.P.'s threatening words.  True
told Choiniere that he had never known N.P. to be violent at
school, but "that does not ensure that [his] behavior couldn't
escalate."  Def.'s Mot. for Summary Judgment, Exh. 1 at 2.

Officer True spoke with Angelika the next day.  He noted
that she "was very defensive" about the fact that N.P. had been
suspended, telling True "that N.P. has made these threats 'year
after year'," but no action had been taken in the past.  Id.
True responded that, while he had played no part in the decision
to suspend N.P. from the summer camp, "the comments that N.P.
made terrorized at least one camper[,] and certainly raised
concern for one other camper and two staff members."  Id.

No formal charges were filed against N.P.  At his
deposition, Officer True explained the Meredith Police
Department's decision not to bring any criminal charges:

> In this case, it was reported that one juvenile
> overheard another saying something, then that was
> forwarded to Sarah Perkins . . . so by the time it got
> to me, it was already – it had already been third-hand.
>
> . . .
>
> I've known [N.P.] for a long time, never known him to
> respond like this.  He didn't seem amped up at the
> time, and then after speaking with Sarah and speaking
> with Vint, they . . . just wanted to address it with
> [Angelika] to ensure that it didn't happen again.

Def.'s Mot. for Summary Judgment, Exh. 8, True Dep. 46:22-47:10.

2.   <u>N.P.'s Suspension</u>

After receiving the call from Perkins reporting what J.S. said about N.P.'s comments, Choiniere met with Meredith's Town Manager, Philip Warren, Jr., to discuss the incident.  Then, when Angelika arrived at camp to pick up N.P. at around 3 p.m. that afternoon, Choiniere handed her a "Meredith Parks and Recreation Behavior Report" recounting the incident.  He told her that, because of N.P.'s threats, Warren had determined that N.P. would be suspended indefinitely from the Town's Parks and Recreation facilities.

Angelika emailed Warren that evening.  She explained that N.P. has an estimated IQ of 41, is intellectually disabled, and "has no real concept of what is being said or discussed beyond the surface," or any idea that he had made any threats.  Pl.'s Opp. to Summary Judgment, Exh. 1, p. 14.  Angelika told Warren that N.P. "enjoys camp so much," and, "knowing [camp] is coming to an end makes him sad," so he had behavioral incidents towards the end of camp in past years.  <u>Id</u>.  She asked to meet with Warren in person to discuss the suspension and stated that: "a significant consequence was an appropriate course of action, but [the indefinite suspension] is extreme for someone who does not even know what he did or said[,] and has the mental ability of a young child."  <u>Id</u>., at p. 15.  Angelika wrote:

I would like to request this suspension be temporary,
maybe for one or two days, but allow [N.P.] to return
to camp on the condition[] that if he has another
outburst like the one today, I would be called
immediately and remove him from camp for the rest of
the day.

Id.

Warren responded the next morning, August 7, 2019.  He told
Angelika that he needed to review the police and internal
reports, and that "threats of this type, regardless of who makes
them, need to be taken seriously."  Id., at p. 13.  He wrote
that N.P.'s "suspension [would] remain in place until the
investigation and research into this matter is completed," and,
once completed, Angelika would be notified of the outcome.  Id.

Angelika responded to the Parks and Recreation Behavior
Report on August 7, 2019, and asked that her written response be
appended to that Report.  In her response, she wrote that N.P.
had a "significant intellectual disability that limits his
understanding of questions being asked," and that he "usually
respond[s to questions] based on what he thinks the person
[asking] wants to hear."  Pl.'s Opp. to Summary Judgment, Exh.
1, at p. 19.  She added, "N.P. does not understand, or even
recall the event, but the staff at the Community Center,
especially those who have known N.P for the past four years,
should understand that just because he is older, his
intellectual ability remains that of a six-year-old."  Id.  She

questioned N.P.'s suspension, arguing that N.P.'s punishment was inconsistent with the camp's treatment of the incident as "non-urgent," as N.P. had remained at camp with other campers for the rest of the day.  Finally, Angelika expressed her disappointment that the Town had not involved her in the decision-making process "in order to get a better understanding of an intellectually-challenged individual."  Id.

Warren emailed Angelika on August 12, 2019.  He informed her that the indefinite suspension had been reduced, but that N.P. would remain suspended for a period of 60 days (through October 7, 2019, a date well after camp ended for the season), at which point Angelika could speak to Choiniere about readmitting N.P. to the Parks and Recreation Department's other programs and facilities.  Warren later stated that the 60-day period was determined to be a "reasonable response based on N.P.'s intellectual disabilities.  . . . [I]f this was a person that did not have intellectual disabilities, they would have been banned permanently from the facility."  Def.'s Mot. for Summary Judgment, Exh. 9, Warren Dep. 32:12-16.  On September 2, 2019, Angelika requested a copy of the investigatory findings that Warren had referenced in his August 7 email.  Warren responded that "the investigation was a review of police and internal reports," and that no formal report had been drafted. Pl.'s Opp. to Summary Judgment, Exh. 1 at p. 16.

On September 4, 2019, Angelika met with Jeannie Forrester and Ray Moritz, two members of the Town's Select Board, to discuss the incident, N.P.'s disability, and her complaints about N.P.'s suspension.  Moritz stated that he and Forrester would present the matter to other members of the Select Board.

On September 16, 2019, the Select Board met in a nonpublic session.  Warren was invited to attend the session, but Angelika was not.  On September 17, 2019, Moritz emailed Angelika, informing her that the Meredith Select Board supported the action taken by the Parks and Recreation Department.

N.P.'s suspension ended on October 7, 2019.  Angelika P. subsequently brought this action seeking declaratory judgment, and compensatory damages.

## DISCUSSION

Defendant has moved for summary judgment on plaintiff's remaining claims: Counts I-III, asserted under Title II of the Americans with Disabilities Act.[1]

---

[1]    At oral argument on defendant's summary judgment motion, plaintiff agreed to voluntarily withdraw the Rehabilitation Act claim.  Therefore, the only claims that remain are plaintiff's ADA claims.

## Title II of the ADA

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" Nunes v. Massachusetts Dep't of Correction, 766 F.3d 136, 144 (1st Cir. 2014) (quoting 42 U.S.C. § 12132). To state an ADA claim, a plaintiff must allege "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." Parker v. Universidad de Puerto Rico, 225 F.3d 1, 5 (1st Cir. 2000). In disability discrimination cases under federal law, the plaintiff "bears the burden of proving each element" of the claim. Cook v. State of R.I., Dep't of Mental Health, Retardation, & Hosps., 10 F.3d 17, 22 (1st Cir. 1993).

Plaintiff advances three claims under the ADA. Her first claim asserts that the Town excluded N.P. from services, programs, and activities because of his disability. In other words, she says that, based upon N.P.'s disability, defendant subjected him to disparate treatment. Her second claim is a

"disparate impact" claim, as she asserts that the Town violated the Act by employing criteria and methods of administration that subjected N.P. to discrimination on the basis of his disability. Finally, plaintiff asserts a "failure to accommodate" claim, alleging that the Town violated the ADA by failing to engage in an interactive process to identify reasonable accommodations that would have allowed N.P. to attend at least a portion of the remaining camp season, as well as other Parks and Recreation activities.

The Town moves for summary judgment on all claims, arguing that there is no genuine dispute as to any material fact, and that it is entitled to judgment as a matter of law.  As a preliminary matter, the Town asserts that Angelika cannot prevail on any of her remaining claims because N.P. is not a "qualified individual" under the ADA.  Once N.P. made threats to kill, the Town contends, that misconduct rendered him "unqualified" to attend the summer camp program.  Turning to the merits of Angelika's specific ADA claims, the Town says the record evidence cannot support a finding that it discriminated against N.P. based upon his disabilities.  The Town's position is fairly straightforward.  It says that N.P. was suspended from its program because Town officials determined that he threatened physical harm to two camp staff members and another camper, and not because of or "by reason of" his disability.  N.P.'s conduct

was plainly unacceptable, the Town argues, and certainly warranted disciplinary action without regard to N.P.'s disabilities.  Finally, the Town notes that a 60-day suspension was, from its perspective at least, both a reasonable and proportionate sanction under the circumstances.

1.  "Qualified Individual"

The text of 42 U.S.C. § 12131 defines a "qualified individual with a disability" as:

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices,  . . . , or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C.A. § 12131.  "When determining if a plaintiff is otherwise qualified, it is necessary to consider the extent to which reasonable accommodations that will satisfy the legitimate interests of both the [institution] and the [plaintiff] are (or are not) available and, if such accommodations exist, the extent to which the institution explored those alternatives."  Joseph M. v. Becker Coll., No. CV 18-40167-TSH, 2021 WL 1209587, at *10 (D. Mass. Mar. 31, 2021).  "Reasonable accommodations are those which do not require a modification of the essential nature of the program or impose an undue burden on the [institution]."  Id. (quotations omitted).

14

Although the Town does not dispute that N.P. is disabled, it asserts that he is not a "qualified individual" under the ADA.  With regard to N.P.'s biological age, the Town concedes that it routinely accommodated his request to attend the summer camp, no doubt recognizing that his developmental age made him an acceptable fit for the program.  See Pl.'s Opp. to Summary Judgment, Exh. 13 (Document No. 19-13, p. 3).  The Town argues, however, that when N.P. made death threats, he was no longer "otherwise qualified" to participate in the program within the meaning of applicable federal law.  That is, once the Town received reliable reports that N.P. made threats of physical harm or death against staff and a camper, and then plausibly determined that he actually made such threats, N.P. no longer met the Town's behavioral eligibility requirements for participation in the summer camp program.

As noted in the court's earlier order in this case, defendant's argument is well-supported by precedent.  Courts have consistently made clear that "[r]equiring others to tolerate misconduct, . . . is not the kind of accommodation contemplated by the ADA."  McElwee v. Cty. of Orange, 700 F.3d 635, 645 (2d Cir. 2012).  See also Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 154-55 (1st Cir. 1998) ("A school's code of conduct is not superfluous to its proper operation; it is an integral aspect of a productive learning environment.  Therefore

[plaintiff] cannot be 'otherwise qualified' unless, with reasonable accommodations, he can meet disciplinary requirements."). C.f., Calef v. Gillette Co., 322 F.3d 75, 87 (1st Cir. 2003) ("Put simply, the ADA does not require that an employee whose unacceptable behavior threatens the safety of others be retained, even if the behavior stems from a mental disability.  Such an employee is not qualified.").  Accordingly, uttering death threats targeting the camp's director, a counselor, and another camper, are (or "constitute") the type of misconduct that could have rendered N.P. unqualified to attend the summer camp.  It is commonly accepted that threats to injure or kill others need not be tolerated in civil society, and the ADA makes no exception for such conduct.

Plaintiff counters that defendant has not established that N.P. actually made the disqualifying threats, noting that the Town offers only inadmissible hearsay as evidence:  Perkins's testimony recounting J.S.'s statements to her, and Officer True's statements repeating what J.S. said to him, and J.S.'s statement as recounted in the police report.

Plaintiff's argument is unpersuasive for a couple of reasons.  First, "[h]earsay is commonly defined as 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the

matter asserted.'" <u>U.S. v. Walker</u>, 665 F.3d 212, 230 (1st Cir. 2011) (quoting Fed. R. Evid. 801(c)).  "The hearsay rule does not pertain to statements adduced merely to show that they were made or that they had some effect on the future actions of a listener." <u>U.S. v. Castro-Lara</u>, 970 F.2d 976, 981 (1st Cir. 1992) (citations omitted).  The Town offers evidence of N.P.'s statements not to prove the truth of the matter asserted – that N.P. was actually intent on injuring – but to establish the reason for his suspension.[2]

---

[2]      The Town relied on the reports made, determined that N.P. made the threats, and determined that such threats are serious enough to warrant discipline without regard to the likelihood of their being carried out.  It then determined an appropriate sanction or corrective response.  While the reaction and judgment of Town officials under the circumstances described might be subject to reasonable criticism, still, the record establishes that they were the product of the Town's considered determination and judgment.  Challenging the exercise of that judgment as an overreaction does not provide a basis upon which discriminatory animus can be found under federal law.

The reports would be admissible to show that the statements were made by N.P., and that the words used "had some effect on the future actions of a listener." <u>Castro-Lara</u>, 970 F.2d at 981.  The Town has established the effects N.P.'s statements had: J.S. was sufficiently concerned that he reported N.P.'s statements to Perkins, and then again to Police Officer True. <u>See</u> Pl.'s Opp. to Summary Judgment, Exh. 8, Perkins Dep. 46:1-47:23; Def.'s Mot. for Summary Judgment, Exh. 1.  Perkins called Officer True after hearing J.S.'s report, and reported an incident of "Criminal Threatening." <u>See</u> <u>id.</u>; <u>see</u> <u>also</u> Pl.'s Opp. to Summary Judgment, Exh. 8, Perkins Dep. 49:10-22.  Officer True responded to the Community Center and conducted an investigation. <u>See</u> Def.'s Mot. for Summary Judgment, Exh. 1. Warren later testified that he understood N.P. "made a threat to injure – to do bodily harm to three people." Def.'s Mot. for Summary Judgment, Exh. 9, Warren Dep. 53:10-12.

Second, the Town is not required to "prove" that N.P. made the threats as reported.  Even if mistaken (i.e., N.P. said something else), the Town still acted based upon reports that N.P. made threats – reports the Town found reliable.  The issue remains the same: did the Town discriminate based on N.P.'s disability by imposing discipline for threatening statements it found that he made.  There is no evidence suggesting that Town officials did not think N.P. made the reported threats.  Nor is there evidence that the Town merely used what it knew (or should have known) were bogus reports as a pretext to discipline N.P. for misconduct when its actual intent was discriminatory.

Instead, the record establishes that the Town viewed N.P.'s reported threats as serious, inappropriate, and inconsistent with the camp's behavioral standards.  See Def.'s Mot. for Summary Judgment, Exh. 4, Choiniere Dep. 73:13-15.  ("My opinion is that the threat itself is what was serious and needed to be taken seriously."); Exh. 6, Mortiz Dep. 44:4-6 ("The seriousness, in my mind, was the fact that he verbalized such a threat and intimidated other children there."); see also id. at 45:20-21 ("It's the threat that's the problem, not whether you follow up on it or not."); 46:18-20 ("I tried to make it clear [to plaintiff] that the making of threats was unacceptable and that we could not fail to take that seriously and act upon it.").

18

Moreover, the Town says it <u>did</u> take N.P.'s disability into consideration when it reduced N.P.'s suspension to 60 days. While plaintiff understandably doubts that it did so, or that it did so adequately, again, the Town's actions have not been shown to be based on unlawful disability discrimination, or based upon any other discriminatory animus.  Insensitivity and inflexibility do not, in this case, add up to discrimination.

A recent District of Massachusetts case, <u>Joseph M. v. Becker Coll.</u>, No. CV 18-40167-TSH, 2021 WL 1209587, at *10 (D. Mass. Mar. 31, 2021), is illustrative.  In <u>Joseph M.</u>, the plaintiff, who suffered from Autism Spectrum Disorder, engaged in misconduct, including threatening to spray gasoline all over his dormmates' rooms, and to "hold a gun" on another student. <u>Id</u>. at *5-6.  Because plaintiff's behavior violated the school's code of conduct, he was dismissed.  <u>Id</u>. at *11.  Plaintiff filed suit asserting claims under the ADA and Rehabilitation Act, arguing that the defendant discriminated against him on the basis of his disability.  In considering whether plaintiff was a "qualified individual," the court noted that instead of identifying and requesting an accommodation that might have allowed him to abide by the school's code of conduct (as in this case), plaintiff instead complained only that "the punishment [for his misconduct] was too severe."  <u>Id</u>. at 11.  Under those circumstances, the court necessarily found that plaintiff was

"not otherwise qualified to continue his education"[3] at defendant's school. Id. at *11.

Reasonable people could well disagree about whether N.P.'s punishment was excessive, but the record evidence demonstrates that Town officials reliably concluded that N.P. made the reported death threats, and plausibly determined that N.P.'s threats were inconsistent with its behavioral standards, which rendered him unqualified for further participation, at least during the suspension period. And, because there is no evidence of discriminatory animus, the court cannot find that the Town's actions were unlawful. Cf., Axelrod v. Phillips Acad., Andover, 46 F. Supp. 2d 72, 83 (D. Mass. 1999) ("Absent evidence that [defendant's] standards were motivated by an intent to discriminate against the disabled, the Court will not substitute its judgment for that of the [defendant] as to whether a given grade is appropriate or whether a student's academic record warrants his dismissal.").

---

[3]   As our court of appeals has stated, "many of the issues that arise in the 'qualified' analysis, also arise in the context of the 'reasonable modifications' or 'undue burden' analysis. That is, if more than reasonable modifications are required of an institution in order to accommodate an individual, then that individual is not qualified for the program." Bercovitch, 133 F.3d at 154.

The Town certainly did not <u>have</u> to act as it did.   Others
acting on the Town's behalf may well have seen things
differently.   But, the Town's imposition of a 60-day suspension
for making threats, even though there was little chance that
those threats could or would be carried out, or that N.P. could
appreciate the potential harm his words might cause, cannot be
reasonably characterized as either plainly discriminatory or
otherwise unlawful.

The record, construed most favorably to plaintiffs, does
not support the necessary allegation that N.P. met the
"essential eligibility requirements" for continued participation
in the Town's summer camp program.   That is, it does not support
the essential allegation that N.P. was a "qualified" individual
with a disability, nor that the Town's actions, however
insensitive and inflexible, were based on N.P.'s disability
rather than his actual misconduct.   Consequently, Angelika
cannot prevail on any of her remaining ADA claims.

Nevertheless, even assuming N.P. continued to meet the
camp's eligibility requirements and was a "qualified individual"
under the ADA (not withstanding his use of threatening words),
Angelika's remaining claims would still fall short.

2.   <u>Disparate Treatment</u>

The record does not support the allegation that the Town discriminated against N.P. based on disparate treatment.  As our court of appeals has noted, disparate treatment claims allege that "disability actually motivated the defendant's challenged adverse conduct," and are "governed by the same analytic framework governing claims of racial discrimination under Title VII of the Civil Rights Act of 1964."  <u>Nunes</u>, 766 F.3d at 144–45.

If N.P.'s reported conduct (uttering death threats) was a consequence of, or was "caused" by, his disability, that would not end the legal inquiry.  The ADA requires that plaintiff establish that the alleged discrimination at issue was "by reason of" his disability.  42 U.S.C. § 12132.  The Town argues that it is entitled to judgment because plaintiff cannot show that N.P.'s disability was the cause of his suspension from the program (even if that disability somehow caused N.P. to utter threats, or if uttering such threats was an unavoidable manifestation of his disability).  Disability-caused misconduct is still misconduct, and absent a request for reasonable available accommodation, misconduct remains subject to discipline.

Plaintiff does not point to any evidence tending to show that the Town's determination was not based on misconduct, or was in any way motivated by discriminatory animus.  See Bercovitch, 133 F.3d at 153 ("there is not a shred of evidence of discriminatory intent toward disabled persons on the part of the school.  There is not even a whisper of a suggestion of stereotyping based on handicap.").

Plaintiff also fails to point to any admissible evidence suggesting that the Town's disciplinary procedures (suspending a summer camper for making death threats) were applied to N.P. in any way that differed from how they have been applied to children without disabilities.  Instead, plaintiff generally argues that the Town "takes 'threats' from non-disabled adults differently," by pointing to statements made by Town Select Board member Jonathan James at an October 29, 2020, meeting. Pl.'s Opp. to Summary Judgment at 22 (emphasis added).  At that meeting, James, commenting about noise complaints involving a restaurant, remarked that, if he lived by the restaurant, and "[i]f I had a gun, I'd shoot that place."  Id.

As our court of appeals has observed, however, "to be probative of discriminatory animus, a claim of disparate treatment 'must rest on proof that the proposed analogue is similarly situated in material respects.'"  Gonzalez-Bermudez v.

23

Abbott Lab'ys P.R. Inc., 990 F.3d 37, 44 (1st Cir. 2021)
(quoting Vélez v. Thermo King de P.R., Inc., 585 F.3d 441, 451
(1st Cir. 2009)) (further quotations omitted).  "Though the
comparison cases need not be perfect replicas, they must be
similar enough that apples are compared to apples."  Id.
(internal quotations omitted).  Mr. James and N.P. are not
"similarly situated."  While James's ill-considered statements
were, of course, objectionable on many levels and subject to
valid social criticism and public accountability, James was not
a camper participating in the Town's summer camp program, under
the direction and supervision of counselors and Town officials.
The Town's officers and subordinate officials were not duty
bound to act as disciplinarians with regard to James's public
statements.  Operating a summer camp for children is an entirely
different matter.  Camp counselors and Town officials were duty
bound to set and administer standards of behavior and rules, as
necessary to provide a safe and acceptable camp environment for
the children under their care.

    In short, then, plaintiff has failed to point to any
evidence that would permit a trier of fact to conclude that the
Town's imposition of discipline upon N.P. for misconduct was
related to his disability – that is, that non-disabled campers
would have been treated differently for similar conduct.

3.   Disparate Impact

To prevail on her "disparate impact" claim under the ADA, a plaintiff must "(1)identify the challenged employment practice or policy, and pinpoint the defendant's use of it' (2) 'demonstrate a disparate impact on a group characteristic ... that falls within the protective ambit of [the ADA]'; and (3) 'demonstrate a causal relationship between the identified practice and the disparate impact.'"  Femino v. NFA Corp., 274 Fed. Appx. 8, 10 (1st Cir. 2008) (quoting E.E.O.C. v. Steamship Clerks Union, Local 1066, 48 F.3d 594, 601 (1st Cir. 1995)) (further citations omitted).

Plaintiff's disparate impact claim here is largely undeveloped.  She fails to identify with any specificity the "criteria or methods" that she says operate to subject "qualified individuals with disabilities to discrimination on the basis of disability" in the Town's summer camp program.  28 C.F.R. § 35.130(b)(3).  Plaintiff also fails to identify any other disabled persons who have been disproportionately impacted by any Town practices.  The only evidence plaintiff offers in support of her claim is that N.P. was suspended from the Town's Parks and Recreation facilities and programs for 60 days.  "This is not enough to demonstrate a disparate impact on the particular group appellant identifies."  Femino, 274 Fed. Appx.

at 10.  Accordingly, defendant is entitled to judgment on plaintiff's disparate impact claim.

  4.  Failure to Accommodate

  Turning to plaintiff's "failure to accommodate" claim, "[f]ederal regulations implementing Title II require public entities to 'make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.'"  Kiman v. N.H. Dep't of Corr., 451 F.3d 274, 283 (1st Cir. 2006) (quoting 28 C.F.R. § 35.130(b)(7)).

  Plaintiff says she "requested a reasonable accommodation for [N.P.'s] disability in her August 6 email to Warren when she notified him of [N.P.]'s disability, explained how his disability impacted his comprehension and use of language, and requested that, if suspension would be required, it last only one or two days."  Pl.'s Obj. to Summary Judgment at 11. Plaintiff says her request was reasonable, given the camp's published discipline policy (that policy was meant to be progressive, beginning with a verbal warning for minor infractions, and escalating to suspension for physical violence and/or multiple behavior report write-ups).  Plaintiff further

argues that her request was reasonable because the Town could not (or, at a minimum, should not) have believed N.P.'s threats were credible, noting that the camp took no immediate action to isolate N.P. following the incident.  Instead, "the camp operated as normal," and N.P. continued to interact with other summer campers and counselors till the day's end.  Id. at 12. Finally, plaintiff says the Town has not shown that her request for accommodation would have caused a "fundamental alteration" to its program and services.

As defendant points out, however, the camp's policy reserved the discretion to discipline camper misconduct by suspending a child's enrollment "at any time."  Pl.'s Opp. to Summary Judgment, Exh. 11, Warren Dep. 52:4-6.  While the camp's policy does not specifically mention "death threats," the Town was not precluded from equating N.P.'s threatening words to "serious misconduct" warranting discipline.  The Town retained the authority and discretion to discipline N.P., or any other camper for misconduct, as it deemed appropriate, so long as the Town did not exercise that authority in a discriminatory or otherwise unlawful manner.  And, again, there is no such evidence in the record.

Moreover, plaintiff fails to proffer evidence tending to show that she requested an accommodation for N.P. that related

to his communicative and cognitive disabilities before the
incident at issue.  Nor is there evidence that she ever
explained to Town officials how N.P.'s disabilities might affect
his conduct, nor did she disclose that those disabilities might
give rise to threatening utterances.  "[T]he ADA's reasonable
accommodation requirement usually does not apply unless
triggered by a request."  Kiman, 451 F.3d at 283 (internal
quotations omitted).  After the incident, Angelika did tell
Officer True (and some Town Select Board members) that N.P. had
made death threats in the past.  See Def. Mot. for Summary
Judgment, Exh. 1, at 2 ("Angie said that NP has made these
threats 'year after year' and nothing has been done about it.");
Exh. 6, Moritz Dep. 41:20-23 ("[Angelika] told us that [N.P.]
had made similar threats in the past and that no actual physical
harm was done by him, even though he had made these threats in
the past.").  But, there is nothing in the record showing that
she ever put the Town on notice that N.P. might make
inappropriate, threatening comments, or that a reasonable
accommodation was being requested with respect to such a
disability-related or disability-caused propensity to utter
threatening words.[4]

---

[4]    Indeed, it might have been difficult to fashion a
reasonable and effective accommodation.  Perhaps a plan calling
for N.P.'s immediate social correction on such occasions, as
well as a minor and appropriate sanction proportionate to N.P.'s
abilities, accompanied by an informed assessment of the risk of

Instead, plaintiff says, only generally, that when N.P. began attending camp in 2016, she spoke with camp administrators about N.P.'s disabilities.  See Pl.'s Opp. to Summary Judgment, Exh. 1, at ¶ 10 ("I met with the camp director . . . to explain NP's multiple disabilities, diagnoses, and current treatments and medication.  I wanted to make sure that they could meet his needs.").  Notably lacking are the details of that conversation, or details regarding any follow-up conversations that may have occurred in which a requested accommodation was discussed – a requested accommodation that might operate to permit N.P. to participate notwithstanding his potential for uttering threats.

The record does demonstrate that plaintiff requested what she calls an "accommodation" after N.P.'s misconduct, but in the form of a less severe sanction.  In other words, after N.P. misbehaved, plaintiff requested that the Town modify its announced discipline, given N.P.'s disability.  But, multiple courts have held that "after the fact" requests for accommodation are necessarily unreasonable.  See, e.g., McElwee v. Cty. of Orange, 700 F.3d 635, 641 (2d Cir. 2012) ("A

---

actual harm posed, and harmful impact, if any, of the words used, along with giving a full explanation of N.P.'s disability to all staff and campers, as well as pointing out the importance of inclusion, might have proven acceptable as a reasonable accommodation for N.P.  But, there was no such request, and even that plan would require some toleration of threats to injure or kill, at least to the extent of wisely considering the context.

requested accommodation that simply excuses past misconduct is unreasonable as a matter of law."). In Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454 (4th Cir. 2012), the Court of Appeals for the Fourth Circuit observed:

> A school, if informed that a student has a disability with behavioral manifestations, may be obligated to make accommodations to help the student avoid engaging in misconduct. But, the law does not require the school to ignore misconduct that has occurred because the student subsequently asserts it was the result of a disability. [Plaintiff's] argument that he was owed an opportunity to continue at the Medical School and correct his misbehavior is, therefore, without merit.

Id. at 465. See also Profita v. Regents of the Univ. of Colorado, 709 Fed. Appx. 917, 923 (10th Cir. 2017) (plaintiff's accommodation request, which came months after he had twice failed rotations and had been dismissed from the M.D. program, did not obligate the defendants to reinstate him "simply because [he] purported to request, at the eleventh hour, an accommodation."). Cf., Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 90 (1st Cir. 2012) ("When an employee requests an accommodation for the first time only after it becomes clear that an adverse employment action is imminent, such a request can be 'too little, too late.").

There is substantial (and essentially uncontradicted) evidence in the record showing that the Town considered N.P.'s misconduct to be serious, and was genuinely concerned about the

disruptive effect of his words on other campers and staff.  See,
e.g., Def.'s Mot. for Summary Judgment, Exh. 6, Moritz Dep.
36:22-37:6 ("I mean the fact that it was a threat that
frightened or could frighten other children and employees there
is a pretty serious incident, even though, you know, nothing
happened.  I mean certainly no one was killed, but just the
threat itself was serious enough to say, [w]e need to take some
serious measures about this."); id. at Exh. 4, Choiniere Dep.
73:13-15 ("My opinion is that the threat itself is what was
serious and needed to be taken seriously."); id. at Exh. 1 at 2
(True Police Report noting that he spoke with Choiniere who
"advised me he was going to have a discussion about the incident
to ensure the safety of all staff and campers.").

While some reasonable and well-informed people might
consider N.P.'s threats as the typical hyperbole of a six-year-
old, and respond accordingly, the record establishes that the
Town considered the matter, and reacted differently.
Importantly, however, the Town reacted based on the misconduct
itself.  It determined that the misconduct warranted a
significant consequence.  And even six-year-old children are
invariably (and not improperly) subject to some form of
corrective action for uttering threats or other inappropriate
words – if only in the form of an oral reprimand and brief
parental or teacher counseling.

N.P.'s disability was taken into account in reducing the severity of the sanction initially imposed, and, while still seemingly harsh, a 60-day suspension cannot be characterized as unlawful.  Programs and activities operated by the Town need not countenance death threats against staff and their families, nor must Town officials hazard a guess about a threat's credibility, or the likelihood of actual future injury, before disciplining threatening behavior.  Again, even if one plausibly posits that the Town should have reacted less harshly, that is not what the ADA commands.  There is nothing in this case, "not even a whisper," Bercovitch, 133 F.3d at 153, suggesting that the Town acted as it did based on N.P.'s developmental disability.

The record establishes that the Town's administrators did take N.P.'s disabilities into account, as well as the information that Angelika provided concerning those disabilities, in fashioning the sanction finally imposed.  See, e.g., Def.'s Mot. for Summary Judgement, Exh. 9, Warren Dep. 38:10-13 ("[In making a decision], I spoke with Mr. Choiniere. I reviewed the [behavior] report that was presented and . . . I also reviewed e-mails that were received from Ms. P."). See also id. at Exh. 5, Forrester Dep. ("I called Angelika and invited her to come over and speak with [me and Ray Mortiz]. She came over to my home and met with the both of us and relayed her – kind of her experience and her concerns about what had

happened."); id. at Exh. 6, Mortiz. Dep. 41:9-14 (describing a
meeting between Forrester, Angelika P. and himself: "[Angelika]
went on to describe her version of the events, . . . what she
believed to be the situation.  She described her son's
disability and the implications to that, and she presented us
with some demands.").

    Given all the above, plaintiff has not proffered evidence
from which a properly instructed jury could reasonably conclude
that N.P. was denied either a (timely) requested or a reasonable
accommodation.

    For similar reasons, plaintiff's arguments concerning
defendant's failure to engage in an "interactive process" to
determine whether a reasonable accommodation might be fashioned
also fails.  First, given the timing of the request, it was
unlikely that such a process was required.  See, e.g., Shaikh v.
Lincoln Mem'l Univ., 46 F. Supp. 3d 775, 786 (E.D. Tenn. 2014)
("The majority of federal courts agree that an after-the-fact
accommodation request is not timely."); see also Halpern, 669
F.3d at 465; Profita, 709 Fed. Appx. at 923. Cf., Jones, 696
F.3d at 90.  But, even assuming that such a process was required
under these circumstances, the record reflects that the Town did
consider the information Angelika proffered, and did interact
with her (at in-person meetings, and via email) concerning

N.P.'s disabilities and limitations, as part of the process leading to its decision to modify the sanction initially imposed.  And, of course, there does not appear to have been any effective, requested, and reasonable accommodation proposed or discussed by the parties, or suggested in the pleadings.

**CONCLUSION**

The Town's officials might have first made an effort to be better informed with regard to N.P.'s disabilities, and their effects, and perhaps could have better balanced the virtually non-existent risk of actual harm against the very important benefits (to N.P. and society in general) of promoting inclusion.  They could have been more empathetic and understanding, could have taken a more accommodating approach, might have been more compassionate and less reactionary, and could have taken the opportunity at hand to better educate and inform camp staffers and campers alike about N.P.'s limitations, and the positive social benefits of supporting the full participation of disabled children in its program, all of which would have helped implement not only the requirements, but the spirit of the ADA.  But, the Town's actions cannot, on this record, be found to have been unlawfully discriminatory based upon disability in violation of the ADA.

For the foregoing reasons, as well as those given in defendant's memoranda (document nos. 18-1 and 20), defendant's motion for summary judgment (document no. 18) is necessarily **GRANTED**.  The clerk shall order judgment in accordance with this order and close the case.


**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

March 9, 2022

cc:  Counsel of Record